Filed 7/27/21  In re C.C. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re C.C., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D078604 |
| Plaintiff and Respondent, | (Super. Ct. No. J519821) |
| v. | |
| C.P., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

C.P. (Mother) appeals from the juvenile court's order terminating parental rights to her daughter C.C. (born 2018). (Welf. & Inst. Code, § 366.26.)[1] Mother contends the juvenile court erred in finding that the beneficial parent-child relationship exception to adoption did not apply because she maintained consistent visitation, and had a positive relationship with C.C. that benefited C.C. (§ 366.26, subd. (c)(1)(B)(i).) Mother contends that the juvenile court should have ordered a legal guardianship as C.C.'s permanent plan because this would provide C.C. with a stable home and allow her to maintain her relationship with Mother. After the completion of briefing in this appeal, the Supreme Court issued its decision in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) which clarified the standards applicable to the parent-child relationship exception. We invited the parties to file supplemental letter briefs addressing the effect, if any, of *Caden C.* to the issues on appeal. Having considered the supplemental briefs filed by the parties, we affirm the order terminating parental rights.

FACTUAL AND PROCEDURAL BACKGROUND

*Petition and Reunification Period*

Mother has a history of methamphetamine use but claimed that she "quit cold turkey" in 2017. Mother gave birth to C.C. in July 2018. Although C.C. was full-term, the hospital placed a nasogastric tube due to poor feeding and decreased activity level. At the time of birth, C.C. and Mother tested positive for methamphetamine and amphetamine, which indicated drug use by Mother within the last one to five days. Medical staff opined that in utero drug exposure caused C.C.'s poor feeding and inactivity. Mother denied drug

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

use during her pregnancy and explained that Sudafed medication or a friend placing a pill into her breakfast may have caused the positive test result.

C.C. remained hospitalized for seven days. Two days after C.C.'s birth, Mother left the hospital against medical advice. Mother missed feedings and trainings on how to care for C.C. The San Diego County Health and Human Services Agency (Agency) offered Mother a voluntary case provided C.C. remained outside Mother's home while Mother received treatment. Although Mother initially agreed, she later changed her mind and indicated her desire to go to court.

On August 8, 2018, the Agency filed a petition under section 300, subdivision (b)(1) alleging that C.C. and Mother tested positive for amphetamine and methamphetamine at the time of C.C.'s birth and that Mother denied a substance abuse problem.[2] At the detention hearing, the court made a prima facie finding on the petition, ordered C.C. detained in out-of-home care, and limited Mother to supervised visits. By the time of the contested jurisdiction and disposition hearing in October 2018, Mother had all negative drug tests since C.C.'s removal, attended services, and the Agency had liberalized Mother's visits to unsupervised. At the hearing, the juvenile court found the petition true, removed custody from Mother, and ordered reunification services for her. In the meantime, C.C.'s maternal aunt asked to be assessed for placement.

In October 2018, at the Agency's request, licensed clinical psychologist Dr. Joseph McCullaugh evaluated Mother because the social worker described Mother as exhibiting an "increased frequency and severity of

---

[2]    The two alleged fathers are not parties to this appeal. Genetic testing excluded one individual and the other individual denied paternity.

mental health symptoms" and Mother had never received a psychological assessment. Dr. McCullaugh found that Mother "demonstrate[d] the intellectual capabilities to communicate, comprehend without conflict, and reason appropriately with an appreciable degree of accuracy" and that she did not have "disorganized, irrational, peculiar, or otherwise impaired processing styles that would hinder her from benefitting from services within the legal timelines of her case."

In November 2018, Mother tested positive for methamphetamine but denied methamphetamine use, claiming that the drug got into her system after exchanging bodily fluids during sex. On February 26, 2019, Mother completed her drug treatment program and reported her commitment to refrain from drug use. As of March 18, 2019, Mother worked two jobs as a dental office treatment coordinator and a food delivery driver. Mother reported that her work schedule allowed her to have overnight visits with C.C. on the weekends and unsupervised visits during the week. In late March 2019, Mother completed an outpatient recovery program. Mother's substance abuse counselor reported that Mother had been forthcoming with her drug problem, developed insight regarding her drug use, and was not in denial at this time.

At the six-month review hearing in April 2019, the court ordered overnight visits. According to C.C.'s foster mother, Mother had been consistently visiting four times a week, C.C. was always happy to see Mother and seemed very comfortable with her. Although the maternal aunt had received approval for relative placement, the placement did not occur because Mother had been approved for overnight visits. At a Child and Family Team meeting held in May 2019, all team members reported that Mother had made progress. Mother's drug counselor stated that Mother "had made 'incredible

progress[,]' met all her goals, and was in compliance with [her] treatment program."

On June 1, 2019, Mother started a 60-day trial visit with C.C. However, on June 27, 2019, Mother tested positive for methamphetamine. In July, Mother missed a drug test, had a diluted drug test, and twice tested positive for methamphetamine. Mother denied using methamphetamine and claimed that her use of an inhaler explained the positive test results. The juvenile court suspended the 60-day trial visit and Mother's visitation reverted to supervised.

On July 30, 2019, the Agency placed C.C. in the confidential resource family home of Mr. and Mrs. C. (the C's). Two weeks after the placement, the social worker informed the C's of a possible relative placement with C.C.'s maternal relatives in Idaho. The C's indicated that if C.C. could not reunify with her biological family for any reason that they were committed to providing C.C. permanency through adoption.

In August 2019, Mother tested negative for any substances in three random drug tests. During this time period, Mother consistently visited C.C. twice a week, she brought snacks and toys for C.C. and the visits were appropriate. In September 2019, Mother had a diluted drug test and missed two drug tests. Mother's substance abuse counselor also reported that Mother's demeanor did " 'not seem right' " and that Mother " 'ramble[d] on and on' " about how the system had wronged her.

On October 28, 2019, Mother tested positive for methamphetamine. At the November 20, 2019, contested 12-month review hearing, the court terminated Mother's reunification services, kept supervised visitation for Mother, and scheduled a selection and implementation hearing under section

366.26. That same day, Mother filed several forms in pro per claiming that C.C. had a twin that Mother had not been allowed to see.

*Post-Reunification Period*

In January 2020, the juvenile court granted the social worker's request for an expedited Interstate Compact on the Placement of Children (ICPC) evaluation of the maternal aunt's home in Idaho. The maternal aunt and her family started video calls with C.C. in January 2020, and in late February 2020 and early March 2020 the maternal aunt had five in-person visits with C.C. that lasted two to three hours each. In the meantime, on February 5, 2020, the juvenile court granted the C's de facto parent status. Mother also continued her twice-weekly supervised visitation. In March 2020, Mother switched from in-person visits to twice-weekly virtual visits due to COVID-19 restrictions. In late April 2020, Mother moved to Idaho. The maternal relatives did not allow Mother to live with them but arranged housing for her through a friend.

In June 2020, Mother told the social worker that C.C. was a " 'triplet,' " and that she delivered two other babies at the time of C.C.'s birth who were taken from her and placed in an " 'undocumented shelter.' " In August 2020, the C's filed a section 388 petition seeking to modify the court's prior general placement order granting the Agency discretion to place C.C. with the maternal aunt without a court hearing. Following a contested hearing, the court denied the petition and authorized the Agency to move C.C. to the maternal aunt's home.[3]

---

[3] The C's appealed from the denial of their section 388 petition to change or modify C.C.'s general placement order. Another panel of this court affirmed the order denying the petition. (*In re C.C.* (May 26, 2021, D078291) [nonpub. opn.].)

In September 2020, the Agency learned that Mother was asked to leave the home where she had been residing. Mother then moved to Washington. In mid-December 2020, the Agency placed two-year-old C.C. with her maternal aunt in Idaho. Mother and C.C.'s prior caregivers continued to have video visits with C.C. two times per week. In the meantime, the court continued the section 366.26 hearing several times based on the parties' request and the court's closure during the COVID-19 global pandemic. In mid-February 2021, the contested section 366.26 hearing proceeded as a trial on the documents. At the start of the section 366.26 hearing, the court dissolved the C's' de facto parent status. The court concluded that the parent-child relationship exception did not apply, terminated parental rights and selected adoption as C.C.'s permanent plan. Mother timely appealed.

DISCUSSION

A. *General Legal Principles*

"At a section 366.26 hearing the juvenile court has three options: (1) to terminate parental rights and order adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care. [Citation.] Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan. [Citation.] The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions." (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

One of the exceptions to the preference for adoption is the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) For this exception to apply, the parent must show by a preponderance of the evidence: (1) regular visitation and contact with the child; (2) the child has a

7

substantial, positive, emotional attachment to the parent; and (3) terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) The existence of this relationship is determined by taking into consideration "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Caden C.*, at p. 634.)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parent-child relationship, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.)

With regard to the court's conclusion that a parent did not meet his or her burden of proof regarding any factual findings, we look to "whether the evidence compels a finding in favor of the parent on this issue as a matter of law." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 647 (*Breanna S.*), disapproved on other ground by *Caden C.*, *supra*, 11 Cal.5th at p. 637, fn. 6.) The question is "whether the . . . evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by

*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, at p. 640.) A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

B. *The Juvenile Court's Ruling*

The juvenile court first acknowledged the evidence showing that C.C. is doing well with her caregivers and that the "overarching trajectory of the law" was to provide children with permanency and stability. The court then stated:

> "The issues related to the mother are very nuanced. They are obvious as to the reasons why we got here initially. But as to the specific requirements in [section] 366.26 the mother has fallen short as it relates to showing the court that beyond the intention and the heartfelt intention of being a parent or mother -- although she has indicated she's willing to sacrifice and do the things necessary to be that parent, that hasn't been borne out by the evidence over the last year and a half.
>
> "She hasn't -- she did not complete all the programming that the court wanted her to complete and ordered her to complete, whether it was drug counseling or individual therapy. And despite [the COVID-19 global pandemic] and other concerns, the court understands it's hard to maintain a relationship when a child is not under your care directly at least.
>
> "But she didn't take advantage of the opportunities to visit and coupled with taking care of the assigned requirements of courses, she did not act as a parent who is really truly willing to sacrifice everything and anything for the child."

The juvenile court terminated Mother's parental rights after finding, by clear and convincing evidence, that C.C. was likely to be adopted if parental rights were terminated, an exception to adoption did not apply, termination of parental rights would not be detrimental to C.C., and it was in C.C.'s best interests to be adopted.

C. *Analysis*

The juvenile court noted that Mother missed opportunities to visit C.C. but did not make an express finding that she failed to regularly visit C.C. Mother claims that she regularly and consistently visited C.C. The Agency does not contest this assertion, stating that it conceded this element during its closing argument. Review of the record shows that although Mother occasionally missed visits, she maintained consistent visitation throughout the proceeding.

Turning to the second element, whether C.C. would benefit from continuing her relationship with Mother, we focus on the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) We consider several factors in examining whether a relationship is important and beneficial, including the age of the child, the amount of time the child spent in the parent's custody, the interaction between parent and child, and the child's needs. (*Ibid.*) Here, C.C. enjoyed her visits with Mother and recognized Mother as " 'Mommy [C.]' " and the maternal aunt as " 'mommy' " or " 'mommy auntie.' " C.C., however, was just two years old at the time of the contested section 366.26 hearing and "too young to understand the concept of a biological parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 459, 467.)

Citing *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), Mother notes that children can have more than one set of parental figures and that the exception does not require a parent to be in a daily parental role. (*Id.* at

pp. 299-300.)  The instant case, however, differs factually from *S.B.*  The father in *S.B.* acted as his daughter's primary caregiver for three years before her removal.  (*Id.* at p. 298.)  After her removal, the father in *S.B.* immediately acknowledged "his drug use was untenable, started services, maintained sobriety, sought medical and psychological services, and maintained consistent and regular visitation" with his child.  (*Ibid.*)  The social worker reported that the father in *S.B.* " 'consistently put[] his daughter[']s needs and safety before his own.' "  (*Ibid.*)  Additionally, a bonding study supported other evidence in the record regarding the minor's "strong attachment" to the father that indicated a potential for harm to the minor should the minor lose the parent-child relationship.  (*Id.* at pp. 296, 298.)

Here, in contrast, Mother failed to act as a protective parent from the outset.  Although Mother claimed that she stopped using methamphetamine in 2017, C.C. tested positive for methamphetamine at birth.  Mother's claim that medication she had taken or some unknown pills that a friend slipped into her breakfast caused the positive result does not explain C.C.'s poor feeding and inactivity which hospital medical staff opined were caused by in utero drug exposure, not drug use on the day of birth.  Throughout the proceeding Mother gave equally implausible explanations for positive methamphetamine test results, including that the drug got into her system after exchanging bodily fluids during sex, or that an inhaler she " 'found' " and used caused the positive result.  Mother never acknowledged that she had a substance abuse problem, which interfered with her ability to benefit from drug treatment and placed her at continued risk for relapse.[4]

---

[4]    Mother contends that the juvenile court "appeared overly concerned" with her lack of progress in fulfilling her obligation to reunify with C.C. and

11

During her life, C.C. spent approximately a month in Mother's custody. Tellingly, after the Agency removed C.C. due to Mother's relapse, C.C.'s caregivers immediately took C.C. to a doctor who diagnosed C.C. with a right ear bacterial infection, cough, and candida diaper rash. Conditions which Mother presumably ignored or failed to detect while she cared for C.C. The Agency determined that Mother had cared for C.C. while under the influence of methamphetamine and that Mother's struggle with substance abuse impacted her ability to parent and provide C.C. with safety and stability. A "significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Here, Mother's unresolved mental health issues and continued struggle with substance abuse negatively impacted the nature of Mother's contact with C.C. during visitation and the formation of a significant attachment with C.C. (*Caden C.*, *supra*, 11 Cal.5th at p. 639 [parent's struggles directly relevant to the " ' "positive" or "negative" effect of interaction between parent and child' " and "indirectly to the harm of removing such interactions from the child's life"].)

It is undisputed that Mother has had positive, age appropriate, and affectionate interactions with C.C. during visitations. Among other things, the two played peek-a-boo, sang songs, reviewed number flash cards, and sang the ABC's. The social worker, however, also related that at times Mother "appeared paranoid during visits and has been distracted with other

failure to complete all programs. We disagree. The juvenile court could properly consider Mother's failure to fulfill case plan requirements and "sacrifice everything and anything for the child" as these facts related to Mother's continued denial of a substance abuse problem and how this continued denial impacted the beneficial nature of her relationship with C.C.

'legal issues[.]' " C.C.'s caregivers also reported that Mother occasionally would discuss her legal issues and needed to be redirected to engage with C.C. Additionally, the record does not show that Mother contacted C.C.'s caregivers outside scheduled visitations to ask, for example, about the results of C.C.'s medical or dental appointments, C.C.'s likes and dislikes, or how C.C. did in daycare.

In her unsworn statement made during the contested hearing, Mother claimed that C.C. constantly asked Mother to hold her, appeared heartbroken and cried because she could not be with Mother, and related that the maternal aunt said C.C. always asked about Mother. The social worker and maternal aunt, however, did not corroborate these claims. Rather, the social worker noted that C.C. did not ask for Mother in Mother's absence or show emotional distress at the end of visitation. We found no evidence in the record to substantiate Mother's claim that C.C. talked about Mother or asked for Mother between visits. (*Caden C.*, *supra*, 11 Cal.5th at p. 632 [courts often consider how children feel about, interact with, look to, or talk about their parents].) Mother's occasional detachment during visitation and C.C.'s lack of distress when parting with Mother and while away from Mother support a conclusion that C.C. did not have an emotional attachment to Mother.

In summary, substantial evidence supports the family court's factual finding that Mother did not prove the existence of a beneficial parent-child relationship. Stated another way, the evidence does not compel a finding in favor of Mother as a matter of law that a beneficial parent-child relationship existed. (*Breanna S.*, *supra*, 8 Cal.App.5th at p. 647.)

Because substantial evidence supported the juvenile court's finding that no beneficial parent-child relationship existed, we need not consider

13

whether the juvenile court abused its discretion when it found that no compelling reason existed for determining that termination of parental rights would be detrimental to C.C. (*Breanna S.*, *supra*, 8 Cal.App.5th at pp. 646-647 ["The court's decision a parent has not satisfied [the parent-child relationship exception] burden may be based on any or all of the component determinations"].) Nonetheless, even assuming C.C. benefitted from her relationship with Mother, Mother presented no evidence showing that termination of that relationship would harm C.C., or that the security and stability of a new home would not outweigh the loss of this relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Instead, the social worker, who had a master's degree in social work and training in assessing a child's permanent plan, opined that termination of parental rights would not be detrimental to C.C. (See *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1427 [social workers are frequently recognized as experts in selecting children's permanent plans]; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1421 (*Beatrice M.*) [court has discretion to determine whether witness is qualified to testify as expert and this determination will not be disturbed absent abuse of discretion].)

Mother did not challenge the juvenile court's finding that C.C. was specifically adoptable, with prospective adoptive parents who were prepared to offer her a safe and loving home on a permanent basis. The social worker noted that C.C. appeared happy and comfortable with the relative caregivers, that C.C. identified their house as "her 'forever home,' " and referred to the caregivers as " 'mommy,' 'daddy,' and 'sissy.' " It was well within the boundaries of the juvenile court's discretion to find that the benefits of adoption outweighed any detriment from terminating Mother's relationship with C.C. We therefore affirm the juvenile court's order as we find no

14

evidence of exceptional circumstances requiring application of the parent-child relationship exception to the termination of Mother's parental rights.[5]

DISPOSITION

The order terminating appellant's parental rights is affirmed.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.

---

[5] Mother suggests a permanent plan of legal guardianship instead of adoption would have allowed C.C. to remain in a stable home with her maternal aunt, while also benefitting from continuing the positive relationship with Mother. However, because Mother's relationship with C.C. did not place her within the parent-child relationship exception, "it necessarily follows that the juvenile court correctly determined that adoption was the appropriate permanent plan for" C.C. (*Beatrice M.*, *supra*, 29 Cal.App.4th at p. 1420.)